THE STATE ex rel. CITY OF CENTRALIA v. WILDER, State Auditor.

**In Banc, April 2, 1908.**

1. **CENSUS: Law 1905: Takers: Appointment.** Under the statute of 1905 (Sec. 5895a, Laws 1905, p. 80), the census-takers, to take a census in a city of the fourth class, must be appointed by the Governor, and if not so appointed, and the result canvassed and authenticated as provided thereby, the census is a nullity.

2. ————: **Ordinance: Not Presented to Mayor.** There was no ordinance book, and the bill or ordinance itself was not found, and the evidence that an ordinance was passed in 1901 authorizing the taking of a census consists of minutes in the journal,

State ex rel. v. Wilder.

in which the pretended ordinance is set out, and the vote of the aldermen thereon, and the authentication of the journal by the mayor's signature, but the journal does not show that the ordinance was presented to and approved by the mayor or by any other official authorized to sign and approve it, or that it was passed over the mayor's veto, or became an ordinance by non-action after presentation to the mayor, nor is there any showing that any of these necessary acts were done. *Held*, that the concurrence of the mayor in the legislative action, of a city of the fourth class is essential to the validity of an ordinance, and the purported ordinance in question is a nullity, and the census taken in pursuance thereto, being itself lost and the only evidence of the number of names it contained being in the form of a recital in the journal of an approval of the census-taker's account of $40.40 at two cents per name, is also a nullity.

3. ———: **Extraordinary Showing.** The court will not shut its eyes to the fact that a domestic census, taken within seven months after a Federal census showing 1,722 inhabitants in a city was taken, showed 2020 inhabitants, an increase of three hundred persons.

4. ———: **Bond Issue: Mandamus.** A writ of mandamus does not go as a matter of course, but being a discretionary writ goes only in the sound discretion of the court. And where the court is asked to compel the State Auditor to approve bonds in the amount of $40,000 issued by a city for a waterworks plant to be owned by the city, on the theory that it had 2,000 inhabitants, the court will look into the validity of the census, and if it does not affirmatively show a valid census and two thousand inhabitants, the writ will be denied.

5. ———: ———: **Sufficient for Dramshop Licenses.** The fact that the city for several years after the alleged census was taken considered it, for the purpose of dramshop licenses, as establishing that the city contained 2,000 inhabitants, will not bind a court of justice to hold that it was sufficient for the purpose of a bond issue.

## Mandamus.

PEREMPTORY WRIT DENIED.

*E. C. Anderson* and *E. W. Hinton* for relator.

(1) The judges who conducted the bond election were officers *de facto* at least, and no mere irregularities in their appointment or qualification can invali-

date an otherwise fair and proper election, in the absence of any statute attaching such a consequence. Sanders v. Lacks, 142 Mo. 255; Lebanon Light Co. v. Lebanon, 163 Mo. 246; Wilson v. Kimmel, 109 Mo. 261.

(2) On the question of population, the commissioner has found that the city had a population of two thousand or more, and that finding is amply supported by the evidence. It is true that the Federal census of 1900 gave Centralia a population of only a little over seventeen hundred. But this is certainly not conclusive that it did not have two thousand some seven years later. In 1901, a city census was taken by authority of an ordinance for that purpose; and while the original census report has long been lost, the record shows that it contained more than two thousand names. This census was taken for the purpose of settling the status of the city in reference to dramshops, and it has been recognized as a city of two thousand inhabitants ever since. On a matter like the population of a town which is not susceptible of direct proof, recognition and reputation are good evidence under the exception in favor of matters of general or public interest. Young v. Railroad, 39 Mo. App. 52. After the issuance of these bonds there was an attempt to take a census, but it was not official because not in conformity with section 5895a, Laws 1905, p. 80, and the board of aldermen rejected the report as incomplete. Hence, that unofficial rejected census was not admissible for any purpose and certainly not sufficient to overcome the regular census of 1901. On a pure question of fact the findings of the commissioners should not be rejected unless clearly unsupported by the evidence.

*Herbert S. Hadley,* Attorney-General, and *N. T. Gentry,* Assistant Attorney-General, for respondent.

The city of Centralia did not have a population of two thousand at the time this election was held. The

United States census, which was taken in June, 1900, shows that said city had a population of 1,722. A census was taken, however, by Mr. Threlkeld, which showed that said city had a population of over two thousand. This census is not in existence, was not returned under oath and was never filed with the city clerk. One witness testified that he saw several names that were twice on the list. It can, therefore, not be considered. R. S. 1899, sec. 6300. This census was never filed with the city clerk, and just how it was taken, or by whose authority, is very doubtful. Realizing that the Threlkeld census was insufficient, an ordinance was passed by the city council of Centralia on the 20th of June, 1907, which provided for the taking of a census in said city. This census was taken by Messrs. White, Helvey, Owens, Sturgis and Day. These gentlemen testified that they acted as census-takers and that the returns made by them, and filed by the city clerk are correct. The returns show that said city's population was 1,905. It is impossible to see how the city of Centralia can extricate itself from the embarrassing position in which it has placed itself. This last census was taken for the purpose of bolstering up the record for the issuance of the bonds in question—the population of said city having been called in question. It is impossible to see how that city could have had a bona-fide population of more than two thousand a short while before this last-named census, and only a few years after the United States census, and the last-named census both show its population to be much less than that sum. Again, the Threlkeld census was not taken in accordance with the law, it not having been filed with the city clerk as required by law.

LAMM, J.—This is an original proceeding here by mandamus to compel the State Auditor to register forty waterworks bonds of the city of Centralia, "five-

twentys,'' each of the denomination of $1,000, the series numbered 1 to 40 inclusive, and bearing date June 1st, 1907, payable to bearer, with interest payable semi-annually at five per cent evidenced by coupons attached.

An alternative writ went and respondent filed his return.

It stands admitted by the pleadings that Centralia is a city of the fourth class. It is alleged in the writ and denied by the return that Centralia has a population of 2,000 or more. It is conceded that the assessed valuation of taxable property in said city in the year 1905, as equalized in 1906, was $692,000; that its prior bonded indebtedness is $18,750; that the bonds in question were presented to the State Auditor for registration and he refused to register them.

Such issues were raised by the pleadings that an order was passed appointing Chas. J. Walker special commissioner, to take testimony and report to this court. Thereat our commissioner took testimony and made report, finding the issues for relator and, as the basis of it, files and submits here the evidence. The Attorney-General filed exceptions to that report; and the cause was finally submitted on the admissions made, the facts found by the commissioner, and the exceptions thereto.

Among the questions made by the Attorney General are the following: (a) That Centralia does not have a population of 2,000 inhabitants; (b) that the bonds in question being waterworks bonds, the Auditor is not required by statute to register them; (c) that the election held in the city of Centralia on February 26, 1907, authorizing the bonds, was irregular and void in certain particulars pointed out; (d) that the ordinance, providing for the levy and collection of an annual tax for the purpose of paying the interest as it falls due and to create a sinking fund for the pay-

ment of the principal, was insufficient, irregular and void in particulars pointed out; (e) that the ordinances of said city providing for the election and declaring the result are invalid in other particulars pointed out; (f) and that the ordinance providing for the execution of said bonds, their registration and sale, was not passed and approved until June 13th, 1907, whereas, the bonds and coupons were executed on June 1st, 1907, hence are invalid on that score.

Other facts will appear in the opinion.

I. The first question made lies at the door of the case, viz.: Could Centralia issue the bonds in question? Attending to that question, it is conceded by briefs and oral arguments of learned counsel that if Centralia did not have 2,000 inhabitants, or more, at the times in hand, then, the city had no power to issue the bonds presented for registration. This concession proceeds on the theory that the bonds could not be issued except under the authority of section 12a of article 10 of the Constitution—said section (12a) having been adopted as an amendment to the Constitution in the general election on November 4, 1902. [Laws 1905, pp. 324-5; Laws 1901, pp. 268-9]. That amendment, *ex vi termini*, is limited to a city containing not more than 30,000 nor less than 2,000 inhabitants.

The commissioner reports his finding on that issue of fact, as follows:

"The Federal census of 1900 shows Centralia contained a population of 1,722. In 1901 the city council passed an ordinance appointing a census-taker to take the census of the city, and the records show that the population of the city at that date was 2,020. The city of Centralia has conducted its affairs since that date as a city containing more than two thousand inhabitants. Shortly after the election held in 1907 on the waterbond proposition, the city council ordered a census to be taken, and the returns show a population of 1,983.

This census was rejected by the city council for 'obvious inaccuracies.'

"I find that at the date of this election in February, 1907, and at the date said bonds were issued on the 13th day of June, 1907, the city of Centralia contained more than 2,000 inhabitants."

The Attorney-General excepts to that finding, for that (he says) it is unsupported by the proof.

Attending to the testimony upon which the commissioner based his finding, it was put in in August, 1907. Mr. Price was put upon the witness stand at the hearing, and testified he was, and had been since April, 1907, city clerk of Centralia. He produced two books at the hearing—one, the journal of the council; the other, an "ordinance book," and testified the "ordinance book" contained ordinances passed, that they did not appear in the journal but were merely there identified by title or number. He read into the record several ordinances passed in 1907, pertaining to the election and bond issue. It was not shown how long the method of bookkeeping indicated, to-wit, the separation of the ordinances proper from the council proceedings, had been in vogue.

However that be, no ordinance relating to the census of 1901 was read into the record from the ordinance book, nor is it claimed one could be found there. But from the journal several pages were read into the record and constitute the evidence upon which the commissioner based his finding of fact touching the census. For example, from page 75 of the journal, under date of January 21st, 1901, there was read into the record the following minutes:

*"Call Meeting.*

"January 21st, 1901, Mayor McCallister called the Board of Aldermen to order at 8 p. m. as per call. R. L. Hope, W. L. Horn, O. B. Wilson, I. J. Head, Alder-

men, answered present. The following business was had:

"1st. Call read to the Board of Aldermen of the City of Centralia, Missouri, and Clerk.

"Gentlemen, you are hereby requested to meet at the City Hall at 8 p. m. Monday, January 21st, 1901, for the purpose of considering the taking of the census and if you consider it in the affirmative, to appoint a suitable person for that purpose.

"Respectfully,

"WILLIAM A. McCALLISTER, Mayor.

"Served the within notice by reading the same to the members of the Board of Aldermen and City Clerk.    Dated January 21st, 1901.

"HARRISON BROWN, Marshal.

"Ordinance passed and read.

*"Ordinance for Taking Census.*

"Be it ordained by the Board of Aldermen of the City of Centralia, Missouri, as follows:    That a census be taken of the City of Centralia, Missouri, to ascertain the number of inhabitants thereof.    Moved and seconded that it be passed to the second reading. Ayes 4; nays 0.

"JOHN E. HINMAN, Clerk.

"Read the second time.    Moved and seconded that it be passed to the third reading.    Ayes 4; nays 0.

"JOHN E. HINMAN, Clerk.

"Read third time.    Moved and seconded it be adopted as read and put upon its final passage.    Ayes 4; nays 0.

"Dated this 21st day of January, 1901.

"JOHN E. HINMAN, Clerk.

"Moved and seconded that Mr. H. C. Threlkeld be employed to take the census at 2 cents a name and the expense to be paid by the city.    Ayes 4; nays 0.

"Moved and seconded that Mr. H. C. Threlkeld commence taking the census at once and complete it as soon as practicable. Ayes, 4; nays, 0.

"Moved and seconded by the Board of Aldermen. Ayes 2; nays 0.            WILLIAM McCALLISTER,
                                                "Mayor.

"Attest: JOHN E. HINMAN, Clerk.
    "Approved February 5th, 1901."

From pages 77 and 78 of the Journal, under a date not shown, the following minutes were read:

"The report of H. C. Threlkeld was read in regard to census and moved and seconded that the census report be received of Mr. H. C. Threlkeld, and Mr. H. C. Threlkeld be discharged and a committee be appointed to *audit the account and a warrant be ordered to pay for same.* Ayes 3; nays 0.

"Moved and seconded that the Mayor appoint a committee. Ayes 3; nays 0.

"Mayor McCallister appoints R. L. Hope and O. B. Wilson. R. L. Hope and O. B. Wilson retired to audit books. R. L. Hope and O. B. Wilson returned with the report.

"Moved and seconded that the report of the auditing committee be received of 2040 names and 19 names were rejected and a warrant for 40.40 be drawn in favor of Mr. Threlkeld. Ayes 3; nays 0."

Mr. Price, when questioned further about the 1901 census and its return, stated he did not know where the Threlkeld census was; that he had examined "the file" to see if he could find the original document. Being further examined on the matter, he said he did not have the Threlkeld census with him though subpoenaed to bring it; that he had made search through the papers on file in his office and had failed to find it, and that (presumably referring to the minutes introduced) he had returned all "the record" he could find relating to that census.

On June 20, 1907, seven days after the passage of the ordinance authorizing the bonds to be executed and four months after the bond election, another census was taken. The ordinance authorizing it narrates, as follows: "That the city proposed to issue bonds in the sum of $40,000 for the purpose of erecting and constructing a waterworks system to be owned and operated by the city to the end that said city may have a waterworks system adequate to its needs and the needs of its inhabitants, and, whereas, the validity of the issue of said bonds depends upon the population of said city and, whereas, the census of said city has not been taken since 1901, be it ordained, etc., as follows: that the census of said city of Centralia be and the same is hereby ordered taken."

Section 2 provides that the mayor is authorized to appoint six census-takers, said appointments to be ratified and approved by the board of aldermen.

Section 3 provides that each census-taker shall take and subscribe an oath as required to be taken and subscribed by other officers of said city before entering upon the duties of their office.

Section 4 provides that when the census is taken, the returns shall be duly canvassed by the board of aldermen and their findings entered of record.

The minutes spread in the journal show that under the 1907 ordinance the mayor appointed five census-takers and his action in that behalf was approved. Under date of July 2, 1907, the following appears in that journal: "Moved and seconded that the census of the city of Centralia recently taken be rejected on account of evident incorrectness of the same. Question: Ayes, 4; nays, 0."

The returns of the 1907 census were before the commissioner and were identified by the takers when on the stand. They testified those returns were cor-

rect, and it appears therefrom that the number of inhabitants in Centralia in June, 1907, was 1905.

Relator objected to the introduction of all evidence relating to the last census, on the following ground: "It was not official because not in conformity with section 5895a (Laws 1905, p. 80) and the board of aldermen rejected the report as incomplete. Hence that unofficial, rejected census was not admissible for any purpose and certainly not sufficient to overcome the legal census of 1901."

The foregoing sufficiently states the pertinent facts, findings and exceptions to enable us to decide the point now being considered.

Can the bonds stand on the cesus of 1901? We think not; because:

Section 5955 in the statutory charter of cities of the fourth class (Art. 5, chap. 91, R. S. 1899) provides that: "No ordinance shall be passed except by bill. . . . No bill shall become an ordinance until it shall have been signed by the mayor or person exercising the duties of the mayor's office, or shall have been passed over the mayor's veto, as hereinafter provided."

Section 5956, Revised Statutes 1899, provides that every bill passed by the board of aldermen and *presented* to the mayor and by him approved shall become an ordinance, and every bill presented as aforesaid, but returned with the mayor's objections thereto, shall stand reconsidered. It further points out a *modus operandi* whereby a bill passed by the board of aldermen and presented to the mayor may become an ordinance over the mayor's objections, and that, should the mayor neglect or refuse to sign any ordinance presented to him and return the same with his objections in writing by a certain time, the same shall become a law without his signature.

Section 6300, Revised Statutes 1899, relating to

cities with special charters, applies by express legislative enactment to cities of the fourth class. That section provides for taking a census by *"ordinance,"* or by proclamation of the mayor if the board of aldermen fail to act under conditions mentioned in the section. It also provides that: "Any person taking such census shall make a return thereof, *under oath,* and file the same with the said clerk, and after such census is taken . . . all courts of the State shall take judicial notice of the population of such city or town."

In 1905 the General Assembly amended the statutory charter of cities of the fourth class by adding a new section to be known as section 5895a, *supra.* [Laws 1905, p. 80.] That amendment also provided for taking a census by ordinance, and for the appointment of census-takers by the Governor, and, when taken, the result is to be reported to the council, spread upon the city records and a copy certified by said clerk under the seal of the city and filed with the Secretary of State.

Section 5895a, *supra,* obviously cannot apply to the census of 1901. Obviously, too, the census of 1907 was not taken in accordance with its provisions—this in sundry particulars. For example, the census-takers were not appointed by the Governor and the result was not canvassed and authenticated as required.

In our opinion, under this record, the census of 1901 was also a nullity. This is so because it is neither shown by primary or secondary evidence that section 6300, *supra,* under which it was taken was complied with in essential matters. That section contemplated an ordinance. It appears from the evidence in the case at bar that the original ordinance bill, if any ever existed, is gone. It is not shown there was a bill but the minutes may be construed as indicating a bill and that it is copied in the journal. The original census is gone. Let it be assumed there was a census return

made and that it is lost.  Absent a published book of ordinances, in this condition of things the only evidence we have of the terms of a census ordinance in 1901 is the minutes of the council; and of those minutes it may be truly said they are more remarkable for what they do *not* show, than for what they do.  For example, they do not show that the ordinance was ever presented to or approved by the mayor or by any other official authorized to sign and approve it, nor do they tend to show that the bill passed by the counsel became a by-law by being passed over the mayor's objections, nor do they tend to show that the bill as passed was presented to the mayor and became a by-law because of his non-action.  Such bill could only become an ordinance under sections 5955 and 5956, *supra,* in one of said several ways.

The general doctrine announced in a line of cases is that provisions of the statute relating to mere form in the passage of ordinances are directory only, unless the statute expressly or impliedly declares the ordinance void if the prescribed form be not pursued. [See St. Louis v. Foster, 52 Mo. 513, and a current of authority flowing from that case.]

The above doctrine may be allowed to cure some of the irregularities shown by the minutes but it is not broad enough to cover irregularities relating to the absence of either primary or secondary evidence that the ordinance was either presented to (or approved by) the mayor, or passed over his objections, or was presented to him and became a by-law by his non-action.  This results from the proposition that when the mayor of a city of the fourth class, as here, is made an integral part of the law-making power, his concurrence in legislative action is essential to the validity of an ordinance. [Eichenlaub v. St. Joseph, 113 Mo. 1. c. 402.]

In this instance the mayor signed the journal but

this act was a mere authentication of the minutes, as such, and it is going too far to say that a signature to a minute book could be fairly held to fill the office of an official signature to an ordinance as contemplated by the statute. [Graham v. City of Carondelet, 33 Mo. 262.]

If, for the purposes of the case, we indulge the hypothesis that (absent primary) secondary evidence be admissible to show the ordinance was approved and to show the census was taken under the restraining and chastening influence of an official oath, and if (absent primary) secondary evidence be permissible to establish a formal canvass and formulation of the census returns, then such evidence should have been introduced as the best obtainable. There is no such proof in this case, worthy of the name.

It is not amiss to note that the Federal census was taken in June, 1900. It appears the domestic census was taken six or seven months later. The federal census showed 1722 inhabitants—all sides agree to . that. It is argued the domestic census showed 2020 inhabitants—an increase of 300, lacking 2, in a half-year.

It has been said that an appellate court ought not to proceed on the theory it does not know what everyone else does know. On that notion we ought not to shut our eyes to the significance of figures indicating (in the absence of adequate cause for the phenomena) a loose screw in the mathematics of a census-taker putting the flight of the burden-bearing and traditional stork so constant, so fast and so *successful* in the good city of Centralia during the late winter, spring and early summer of 1901.

Not only so, but it is only by the most shadowy inference that the returns of the domestic census-taker can be got at. True, an *auditing* committee was appointed to audit his bill at two cents a head and to

report the amount due him. This committee reported and it is on its report and the action of the council thereon (both mere incidents of the question in hand) that we must by inference deduce a canvass and formulation of the figures of the census returns, if at all. It would seem to be a travesty on the law to elevate this shadowy inference into the substance of a census return.

Official actions of the plain, average citizens composing the board of aldermen of cities of the fourth class are not to be viewed hypercritically. They are entitled to every reasonable intendment to sustain them. This court in many cases has shown its willingness to go a great ways on that road. But when we are asked to sustain a bond issue of $40,000, in a small city, already indebted in the rise of eighteen thousand dollars, every step leading up to it becomes one to be judicially viewed with solicitude and jealously. If the bonds had been issued and put in circulation so that the rights of innocent holders were at stake another question might be here. In such case it might take a pound of cure. But this is an application for a peremptory writ of mandamus. The object of the writ in this case is to force open the door to the circulation of those bonds. Now, it is settled law that a writ of mandamus does not go as of course. Being a discretionary writ it goes only in the sound discretion of the court—a discretion to be soundly exercised. So that we have a case in which the-ounce-of-prevention doctrine is not amiss.

It is argued by learned counsel that Centralia, after the census of 1901, acted on the theory it had 2,000 souls in issuing dramshop licenses. It is argued that such census was taken for dramshop purposes. Of this argument it may be said, that what the needs or rights of Centralia may be in a dramshop way we need not decide in this case, but we have no hesitancy

in deciding and do decide that, even though the city treated its dramshop census as sufficient for dramshop purposes, as argued (of which there is not a *scintilla* of evidence), yet there is still room for a court of justice to hold that such dramshop census as exists in Centralia was not sufficient for a bond issue. The census ordinance of 1907, if good for nothing else, serves to indicate that at one time the strong impression of the city fathers ran the same way.

II. The only valid census before us is the Federal census. Under that the bonds could not be issued. In that view of the case, other points briefed and argued by counsel are not reached and may be reserved.

The alternative writ of mandamus is quashed. The peremptory writ is denied. All concur.